No. 4167.

(Court of Appeal, Parish of Orleans.)

## JOHN MINOT vs. PATRICK J. KING.

### RULE ON CLERK.

Paragraph IV of Art. 131 of the Constitution, as amended by Sec. 6, of the XXIII amendment to the Constitution, does not abrogate Sec. 7 of Act 136 of 1880, which fixes the fee which the Clerk of this Court may charge and retain as his compensation for filing appeals from District Courts.

H. A. Moise, Appellant.

W. J. Hennessey and Dinkelspiel, Hart & Davey, for Clerk.

MOORE, J. This is a rule sued out by the appellant in an appeal taken since the 1st January, 1907, from a judgment rendered by the Civil District Court for the Parish of Orleans, in a suit in which the amount involved is less than five hundred dollars, to test the right of the clerk of this Court to charge as his compensation for filing the record of appeal herein, the sum of fifteen dollars.

The contention of mover is that the clerk may not lawfully exact a fee of more than five dollars for filing the record of appeal in any case appealable to this Court, forasmuch as the amendment to the fourth paragraph of Article 131 of the Constitution, adopted at the Congressional election held in this State November 6th, 1906, fixes the fee for filing the record of appeal in each case at this latter sum.

The amendment referred to provides, *inter alia;* that:

*Until otherwise provided by law* xxxxx the costs of filing same (appeals returnable to this Court) shall not exceed five dollars."

Sec. 6 of XXXIII Amend't Con. Act No. 137 of 1906 P. 227.

It may not be doubted that if this paragraph constituted the sole reference to this subject matter to be found in the Constitution, and if there exists no statute fixing and regulating such fees, the argument of the mover would be persuasive and

312

would, therefore, have to be admitted.

But is it true that this is the sole reference made on the subject by the Constitution; and is it true that there exists no law fixing such fees?

The sixth paragraph of Art. 131 of the Constitution provides that:

"There shall be a clerk of said Court of Appeal (Court of Appeal for the Parish of Orleans) who shall be elected by the qualified voters of said Parishes, (the Parishes within its territorial district) for a term of four years; *he shall be entitled to charge and retain as his compensation such fees as may be allowed by law.*"

Art. 154 provides that:

"Until otherwise provided by law the costs to be paid *clerks,* sheriffs, constables, recorder of mortgages and register of conveyances, *shall be as now fixed,* except that in no case shall the cost of filing appeals from the *City Courts* exceed the sum of five dollars," and

Art. 325 declares:

"That all laws in force in this State, at the time of the adoption of this Constitution, not inconsistent therewith, and Constitutional when enacted, shall remain in full force and effect until altered or repealed by the General Assembly, or until they expire by limitation ......"

These several constitutional provisions, in order to ascertain the true meaning and intent of the particular paragraph under discussion, must be read together and construed under the guidance of that cardinal canon of interpretation which requires that all parts of an instrument must be construed together with a view to give effect to every part and to harmonize all the parts into uniformity.

As said in State ex rel Patton et als 32 A. 1200-1206: "When the articles of a constitution are subject to judicial analysis and for criticism, Courts of justice are to be guided by the rules which the wisdom of men has prudently established and cautiously applied in the interpretation of all instruments, whether of a general or local, public or private character, whether intended to regulate the intercourse of nations, states, corporations or individuals among themselves.

313

The most important and salutory of these rules is, that the whole instrument must first be attentively surveyed; and that the purpose and intention of its authors must next be diligently searched, gathered and deduced from the entire context so as to make all the parts appear and prove rational, harmonious, efficacious and uniformly conducive towards the practical accomplishment of the objects in view."

Read in the light of all these constitutional provisions it is manifest that this constitutional amendment relegated to the legislative department of government the fixation of the fees of the clerk of this Court, and that the fixation of the clerk's fees at five dollars by the amendment of paragraph 4 of Art. 131 is but conditional and contingent, its operative effect depending upon the non-existence of expression of legislative will concerning such fees.

If, therefore, there is extant any law fixing the fee which the clerk may "be entitled to charge and retain as his compensation" for filing records of appeals in appeals from the District Courts of the Parishes within the territorial jurisdiction of this Court and returnable to us, then the contingency upon which the constitutional fixation of these fees is made to depend, does not exist, and, as a consequence, the statutory regulation thereof, and not the conditional and contingent constitutional fixation of these fees, prevails. There is such statute. Sec. 7 of Act 136 of 1880 provides:

"That in all cases appealed to the Court of Appeal for the Parish of Orleans, the following charges shall be made, and no more:

First—In all cases where the amount involved is less than $500.00, exclusive of interest $15.00; second—in all others $25.00.

It is argued, however, that the amendment to par 4 Art. 131 Con, *supra,* contemplates the abrogation of, and does in fact abrogate all statutory enactments of date prior to the 1st of January, 1907, concerning the fixing of the clerk's fees, and that the purpose of the amendment was to maintain the fee at five dollars until *subsequent* legislation might otherwise provide.

As we have said, it is manifest that the amendment referred to clearly conveys the idea that to the legislative department

properly belongs the duty of fixing and regulating such fees, and, when this paragraph is read into, and construed with Art. 131, supra, which declares that the clerk "shall be entitled to charge and retain as his compensation such fees as may be allowed by law," and with Art. 154 which provides that the said fees *"shall be as now fixed,"* it is equally manifest that the fee as fixed by the amendment is to so remain, only in the absence of a law otherwise providing, whether such law presently exists or may be thereafter enacted.

Nor is there wanting evidence that a similar construction was put upon this amendment by the General Assembly which framed the joint resolution submitting this amendment to the people for adoption.

Section 5 of the joint resolution, which joint resoultion originated in the House, purported an amendment of Art. 106 of the Constitution. As it passed the House and as reported to the Senate, it contained this clause: "The costs of appeal in any case appealed to the Courts of Appeal shall not exceed five dollars." This, if permitted to stand, would have applied to this as well as to the Courts of he first and second circuits. Realizing, however, that in the first and second circuits, the clerks of the district Courts in the Parishes where the Court of Appeal may hold its session are made ex-officio clerks of the Court of Appeal, whereas for the Court of Appeal for the Parish of Orleans an independent clerk is elected, whose only revenue, as such, is the fees to be charged for filing appeals to this Court, the Senate amended the joint resolution by inserting, after he word "appeal," the words: "of the first and second circuits," so as to confine the fee of the five dollars to these circuits only. Senate Journal 1906, P. 427. As thus amended the joint resolution was passed and returned to the House; the Senate amendment concurred in and the joint resolution adopted.

So that it now reads: "The costs of appeal in any case appealed to the Courts of Appeal of the first and second circuits, shall not exceed five dollars." (Art. 106 as amended by the 23rd amendment to the Constitution, adopted Nov. 6th, 1906, Act No. 137, Sec. 6, 1906.)

There is likewise judicial authority for the interpretation we

have put upon the amendment referred to.

In State ex rel Patton et als vs. Shakespeare et als, 32 A. 1200, the question was whether an election for Mayor and Administrators in the City of New Orleans held on the second Monday of November, 1880, in accordance with the Acts of 1870 E. S. 1871 and 1877 fixing that day for such election, was lawful in view of the fact that the constitution of 1879 provided the municipal election in the City of New Orleans should be held on the same day as the general state election, the latter election being fixed by the Constitution for the Tuesday next following the third Monday in April.

The articles of the constitution of 1879 reads as follows:

"Art. 191. Until otherwise provided by law the general State election shall be held once in every four years, on the Tuesday next following the third Monday in April."

"Art. 192 Parochial and the municipal elections in the Cities of New Orleans and Shreveport shall be held on the same day as the general State elections, and not oftener than once in four years."

The Acts of 1870-71 and 77, as stated, provide that the municipal election shall be held once in every four years on the second Monday of November. The Court in an elaborate and well considered opinion, pronounced by the Chief Justice, held that the Constitutional provisions quoted were not intended to and did not abrogate existing statutes on the subject of the day when municipal elections should be held in the City of New Orleans; that the articles of the constitution were contingent and not self acting, and that until the General Assembly otherwise provided, the pre-existing statutes fixing the second Monday in November as the day for holding such elections were in full force and effect. See also State ex rel etc. vs. Hicks 837 and City of New Orleans vs. Wood & Bro. 34 A. 733.

We conclude, therefore, that Sec. 7 of Act 136 of 1880 has not been changed, affected or repealed by the amendment of paragraph four of Art. 131 of the Constitution; that the clerk of this Court is entitled to charge and retain as his compensation for filing records of appeal from any of the district Courts from which appeals are returnable to this Court, the sum of fifteen dollars when the amount involved is less than $500.00 exclusive of interest and twenty-five dollars in others; and

316

that as the clerk has charged in the instant cause the fee allowed him by law, the rule is discharged.

Feby. 18th, 1907.

## ON THE MERITS.

Issues of fact only are involved herein.

Appeal from Civil District Court, Division "C."

Geo. Montgomery, for Plaintiff and Appellee.

H. A. Moise, for Defendant and Appellant.

ESTOPINAL, J. Plaintiff alleges that in the month of June, 1905, he sold and delivered to the defendant, forty thousand feet of gum lumber at the agreed price of eleven dollars per thousand feet, making the aggregate sum of four hundred and forty ($440.00) dollars, said sum to be paid by the defendant four (4) months after the date of the agreement of sale.

The defendant in his answer admits a verbal contract with plaintiff to purchase forty thousand (40000) feet of lumber at the price of eleven ($11.00) per thousand and that the price was to be paid four months after date, and defendant adds, "to be reckoned from the complete delivery and acceptance of said lumber."

Then follow some averments in their answer in reference to the quality of the lumber bargained for, defendant claiming "that said lumber was to be known as good white gum lumber free from all mill culls," and not "gum lumber," as alleged by plaintiff. The further averment is then made by defendant that a certain pile of lumber was designated by plaintiff as the lumber sold him (defendant) but that when he (defendant) sent his wagon to get a load of said lumber he was prevented from taking it, the same not being plaintiff's property; that he (defendant) was directed to another lot of lumber which was plaintiff's, but this he *refused to take in whole or in part,* said lumber being filled with mill culls, and was red gum and not white gum free from mill culls as per agreement with plaintiff. Defendant then avers that he is owner of a box factory and

317

that plaintiff's failure to deliver the lumber has caused him a loss which he fixes at three hundred ($300.00) dollars, and for which he reconvenes herein.

The evidence shows that defendant accepted schooner tally and without delay began to haul the lumber away. Before hauling away any of the lumber, however, King, defendant, was required to secure an order from Minot. This order was secured and delivery thereby perfected. It is in evidence that defendant hauled away several thousand feet of lumber, and though he may have complained to others about the inferior quality of the lumber or of Minot's failure to carry out his contract, it is quite evident that the learned judge of the District Court did not believe that the defendant had at any time notified the plaintiff, though the former states that he did. We have examined carefully this part of the testimony. The defendant when asked whether he would accept the tally of any one not employed by him replied that he always employed his own man and had every foot of lumber tallied, and that right after he bought this lumber from the plaintiff he sent, or had sent, an expert in the person of Mr. Oertling to inspect the lumber and that he (Oertling) refused to take it. On that point it is abundantly shown that defendant's son, who was the manager of the box factory secured control of a pile or piles of lumber containing 39000 feet of lumber and accepted the schooner tally and immediately began to haul the lumber. Mr. Oertling was sent to inspect the lumber, but that was long after delivery by Minot (plaintiff) and acceptance by defendant's agent, Tom King, his son.

Defendant when interrogated on the 16th of October as a witness testified *that he had never notified the plaintiff, or complained to him because he could never see him.* On the 22nd of the same month being recalled, the defendant was asked by his counsel:

Q. *Mr. I don't believe the last time you were on the stand, I asked you if you gave Mr. Minot notice?*

A. No, sir; I didn't; I went to see him.

Q. How many times did you call to see him.

A. *I think three times on Burgundy Street.*

Defendant claims to have had a conversation with Minot, who promised to make matters alright. Minot denies that

318

defendant ever called on him or that he was ever notified in any manner.

In view of the importance of this fact, and material as it is in determining this controversy it is more than passing strange that the defendant should have forgotten that he had held this important conversation with plaintiff. His statement that he did may be true but its force is destroyed by a former statement that he did not see plaintiff.

A contract in writing shown defendant by the plaintiff is not the contract in this case, but simply shows where the lumber is to come from and its character. It is a contract of the C. N. Maestri Co., of which Minot was manager with H. F. Lewis accepting and confirming his offer of 125,000 feet of *Black Tupelo, Sweet Gum and Magnolia.* It was from this lot of lumber that defendant was to get the 40,000 feet. It will be observed that there is no lumber designated as white gum in that contract, and Minot, the plaintiff, in his testimony says that there was no question of white gum when he closed with King, defendant.

The issues in this case were passed upon by the District judge, who saw and heard the witnesses and unless his findings were manifestly erroneous we should hesitate to disturb it. Our examination of the record satisfies us that the judgment appealed from is not error and it is affirmed.

May 6th, 1907.

Rehearing refused May 20, 1907.